IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARSHA A. LEWIS         *
                                         *
      v.                                  *   Civil No. JFM-02-3147
                                         *
BOARD OF EDUCATION OF         *
TALBOT COUNTY, *et al.*            *
                                         *
                                    *****

MEMORANDUM

Marsha A. Lewis, a former employee of the Board of Education of Talbot County ("the Board"), has sued the Board and various agents of the Board for violations of her federal and state constitutional rights, breach of contract, promissory estoppel and wrongful discharge. Defendants have moved to dismiss the complaint for failure to state a claim or, in the alternative, for summary judgment. For the reasons set forth below, defendants' motion to dismiss will be granted in part and denied in part.[1]

I.

According to the allegations in the complaint, Ms. Lewis began working for the Board as a secretarial associate on January 21, 2000. (Compl. ¶ 9.) Her immediate supervisor was the plant operations division manager, Gelson Brooks. Within her three month probationary period, Lewis

---

[1] Defendants have submitted with their reply memorandum affidavits that appear to establish that plaintiff was a probationary employee. The facts stated in these affidavits strongly indicate that plaintiff cannot appropriately assert a property interest claim. However, I will not (as defendants request) convert their motion to dismiss into a motion for summary judgment as to the property interest claim because plaintiff has not been provided proper notice and a reasonable opportunity to present counter affidavits.

received a written reprimand for leaving personnel information face-up on her desk. (Compl. ¶¶ 11, 13.)

On March 30, 2000, Lewis brought to work a hand-written letter her husband, Mitchell Wise, requested she place in typewritten format on a work computer. (Compl. ¶14.) The letter expressed Mr. Wise's opinions concerning a range of "controversial social issues including gun control, youth violence, and public school management." (Compl. ¶17.) Lewis allegedly typed the letter on her own personal time and, a couple of days later, made some minor changes to the same letter, also on her own personal time. (Compl. ¶18.)

On April 5, 2000, Brooks asked Lewis to meet with him. (Compl. ¶19.) Also attending this meeting were John Masone, Assistant Superintendent of Support Services for the Board, Shirley Pinkett, and Midge Kroll. (*Id.*) Lewis was allegedly asked if she had typed the "inflammatory" letter. (Compl. ¶ 20.) When she confirmed she had brought the letter to work, she was terminated with severance pay. Lewis claims she was fired without an opportunity to respond in any meaningful, explanatory way. (Compl. ¶ 21.) While clearing out her desk, Lewis was allegedly informed by Ms. Pinkett that she had been fired due to "the mentioning of the schools and who the letter was sent to." (Compl. ¶ 22.)

The day after Lewis's termination, Brooks composed a letter to John Masone justifying his decision. (Compl. ¶ 23.) In the letter, Brooks claimed Lewis had problems with processing preventive work orders, maintaining attendance records and duplicating purchase orders. (*Id.*) He also referenced the discovery of the letter regarding gun control. (*Id.*) Brooks communicated to Masone that Lewis was unable to make good judgment calls and had therefore been dismissed prior to

the end of her probationary period.

Lewis scheduled a meeting with J. Samuel Meek, the Superintendent of Talbot County Public Schools, approximately one week after her termination. (Compl. ¶ 26.) At this meeting, plaintiff was allegedly reminded of the tragedy at Columbine High School in Colorado to emphasize the "sensitive nature" of the issues addressed in the letter and told she was approaching the letter with a "simplistic view." (*Id.*) Meek did not take any action after his meeting with Lewis, and Lewis was not re-employed by the Board.

Two and a half years later, Lewis filed suit against the Board, as well as Brooks, Masone, and Meek, each in their official and individual capacities. The first four counts of the complaint allege violations of Lewis's federal and state constitutional rights and are directed at all defendants in all capacities. Count I alleges a violation of Lewis's First Amendment rights under 42 U.S.C. § 1983. Count II, also under § 1983, alleges Lewis was denied procedural due process with respect to her property and liberty interests in violation of the Fourteenth Amendment. This count also alleges she was denied substantive due process. Count III is identical to Count II except that the due process claims are brought under Article 24 of the Maryland Declaration of Rights. In Count IV, Lewis alleges under 42 U.S.C. § 1985(3) that the defendants conspired to deprive her of her rights based on a discriminatory animus against "all individuals politically opposed to gun control laws." (Compl. ¶ 52.) Counts V-VII are Maryland state law claims directed exclusively at the Board asserting breach of contract (Count V), promissory estoppel (Count VI), and wrongful or abusive discharge (Count VII).

II.

Defendants, in varying degrees, assert their sovereign immunity from suit in federal court under

the Eleventh Amendment. Because the Board is entitled to this immunity with respect to all claims against it and other defendants are entitled to the immunity in specific contexts, I will address the sovereign immunity issue prior to addressing any of the substantive claims.

State agencies and state instrumentalities are entitled to sovereign immunity from suits brought by individuals in federal court, unless the suit is brought pursuant to a statute passed by Congress containing a valid abrogation of sovereign immunity. *See* U.S. Const. amend. XI; *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) (confirming § 1983 contains no valid abrogation of Eleventh Amendment immunity). This immunity applies to all forms of relief, legal and equitable, directly against the state or its instrumentalities. Similarly, the law is clear that individuals sued in their official capacity as state agents cannot be held liable for damages or retrospective injunctive relief. They may, however, be sued for prospective injunctive relief to end violations of federal law and remedy the situation for the future. *See Edelman v. Jordan*, 415 U.S. 651 (1974) (articulating the distinction between retroactive and prospective injunctive relief); *Ex parte Young*, 209 U.S. 123 (1908); *Milliken v. Bradley*, 433 U.S. 267 (1977). Finally, individuals sued in their personal capacities under § 1983 or § 1985, are not immune from suit in federal court even if performing acts within their authority and necessary to fulfilling governmental responsibilities. *See Hafer v. Melo*, 502 U.S. 21 (1991) (holding a government official, in her individual capacity, is not immune from suit arising from an employment decision).

The nature of the entity and its relationship with the state are critical to a determination of the entity's sovereign immunity under the 11th Amendment. The primary factor to be considered is whether a judgment against the governmental entity would be paid from the state's treasury. *See Hess*

*v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Generally, if the judgment would be paid from the state treasury, the inquiry is at an end. *See Hess*, 513 U.S. at 50. If the judgment would not be paid from the state treasury, the factors to be considered in determining whether suit against the state would nonetheless be an affront to its "sovereign dignity" are "(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns – whether local or statewide – with which the entity is involved; and (3) the manner in which State law treats the entity." *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001). If the judgment would not be paid from the state treasury, the "sovereign dignity" factors may sufficiently tie the entity to the state so that suit against the entity would amount to suit against the state. *See id.*

The Board of Education of Talbot County, and therefore its agents acting in an official capacity, are entitled to sovereign immunity to the extent provided under the Eleventh Amendment. Defendants do not strongly dispute the fact that a judgment in plaintiff's favor would not have a direct impact upon the state treasury. Rather, they address their argument primarily to the three factors of the "sovereign dignity" part of the analysis.

In *Cash*, after a thorough review of North Carolina's system of public education, the court determined that the Granville County Board was not an arm of the state and should not be accorded sovereign immunity. *Id.* at 224-27. While the *Cash* opinion strongly informs the analysis of a school board's sovereign immunity within the Fourth Circuit, it is not dispositive of this case. *Cash* lays out the test to determine whether suit against a school board essentially constitutes suit against the state, but the decision does not imply that county school board's in other states should automatically be denied

5

sovereign immunity. The lower federal courts of Maryland have consistently held in published decisions both before and after *Cash* that the school boards of Maryland are entitled to sovereign immunity. *See, e.g., Adams v. Calvert County Pub. Sch.*, 201 F. Supp. 2d 516, 521 (D. Md. 2002); *Biggs v. Bd. of Educ. of Cecil County*, 229 F. Supp. 2d 437, 444 (D. Md. 2002); *Jones v. Frederick County Bd. of Educ.*, 689 F. Supp. 535, 538 (D. Md. 1988). I agree with those decisions, but will nonetheless address the parties arguments and explain my determination.

The Talbot County School Board is less autonomous than the board at issue in *Cash* in many respects. Among other things, the Talbot County Board's members are appointed by the Governor of Maryland, not locally elected. *See* Md. Code Ann., Educ. § 3-108. In Maryland, the Board may buy, sell, and hold property only with the approval of the State Superintendent. *See id.* at § 4-115. Each new school established by the Talbot County Board becomes a "part of the State program of public education." *Id.* at § 4-109. The Board's employment and teacher certification practices are more closely regulated in Maryland than those of the boards in North Carolina. *See, e.g., id.* at §§ 6-202 & 4-205(c) (the state, through the State Board of Education, is the ultimate judge of the validity of dismissals for both professional and non-professional employees); Md. Regs. Code tit. 13A § 07.02.01 (state controls form of contract for certificated employees); Md. Regs. Code tit. 13A §§ 12, *et seq.* (state defines and enforces teacher certification requirements). While both boards exercise some budgetary discretion, the Talbot County board must submit to an annual audit conducted by the state. *See* Md. Code Ann., Educ. § 5-113. Moreover, the State of Maryland retains the power to reconstitute and oversee the operation of schools that do not meet state standards for student performance. *See* Md. Regs. Code tit. 13A § 01.04.08. The Talbot County School Board does not

operate with the same degree of autonomy as do the school boards of North Carolina.

On the other hand, plaintiff is correct in contending that the scope of concern of the Talbot County School Board (the second factor articulated in Cash) is more local than statewide. Defendants argue that, in contrast to North Carolina, the state program of free public education is mandated by the state constitution of Maryland and the boards are created by the legislature to fulfill that statewide mandate. *See* Md. Const. Art. VIII, § 1; *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 747 A.2d 625, 629 (Md. 2000). While the source of the power exercised by the county board may flow more directly from the state constitution and the legislature of Maryland because of the state constitutional mandate regarding free public education, that does not change the fact that the county school board addresses its efforts to maintaining and improving the local educational system. *See Cash*, 242 F.3d at 226 (comparing situation in which a county sheriff pursues the statewide goal of law enforcement but has primarily local jurisdiction). However, though this "scope of concern" factor tilts slightly against a finding of sovereign immunity, it is outweighed by the other factors.

Maryland law, through statute and judicial opinion, treats the county school boards as agents of the state. The Maryland Court of Appeals undoubtedly considers the county school boards instrumentalities of the state rather than independent, local bodies. *See Board of Educ. of Prince George's County v. Prince George's County Educators' Ass'n*, 522 A.2d 931, 936 n.3 (Md. 1987) ("County boards of education are, of course, state agencies and not agencies of the county government."); *Montgomery County Educ. Ass'n v. Board of Educ. of Montgomery County,* 534 A.2d 980, 987 (Md. 1987) (recognizing the local boards as state agencies); *Board of Educ. of Montgomery County v. Montgomery County*, 205 A.2d 202, 205 (Md. 1964) (noting the local

school boards are not a branch of the county government nor an agency under its control).  This is in direct contradiction to the manner in which the courts of North Carolina treat local school boards.  *See Cash*, 242 F.3d at 226.  Similarly, the statutory law of Maryland does not include county school boards within the definition of "local government" in the Local Government Tort Claims Act, but the statutes of North Carolina characterize county school boards as local governing bodies.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-301; *Cash*, 242 F.3d at 226.

For these reasons, I agree with the opinions rendered before and after *Cash* holding that the county school boards of Maryland are entitled to sovereign immunity.  Therefore, all of the claims against the Talbot County School Board will be dismissed.  Likewise, claims against the individual defendants in their official capacities for damage or retrospective injunctive relief will be dismissed.[2]  *See Edelman v. Jordan*, 415 U.S. at 667-69; *Ex parte Young*, 209 U.S. at 151 (citing *Hagood v. Southern,* 117 U.S. 52 (1886)).

### III.

### A.

Count I of the complaint, alleging violations of § 1983 based on a denial of First Amendment rights, survives the motion to dismiss insofar as it states claims for prospective injunctive relief against the individuals in their official capacities and for damages against the individuals in their personal capacities.  *See Perry v. Sinderman*, 408 U.S. 593, 598 (1972) (providing the plaintiff an opportunity

---

[2]Counts V, VI, and VII are asserted only against the Board.  Because I am dismissing those counts on Eleventh Amendment grounds, I need not address the other issues raised by the motion to dismiss as to them.

to prove defendants failed to rehire him as a reprisal for the exercise of constitutionally protected rights).

B.

Analysis of Count II, alleging violations of § 1983 based on denial of plaintiff's procedural and substantive due process rights under the Fourteenth Amendment, requires that plaintiff's claims be broken down into four component parts. Plaintiff asserts she had: (1) a property interest in her job; (2) a liberty interest in her job; (3) was deprived of both without procedural due process; and (4) was deprived of a substantive due process right in her continued ability to speak about issues of public concern.

(1)

Plaintiff alleges in the complaint that she "had a property interest in her job as a Secretarial Associate Board," that she entered into a legally binding contract with the Board and "that her continued employment with the Board [was] conditioned upon the satisfactory performance of her job." (Compl. ¶ 11, 57 & 58.) She also alleges, however, that she was discharged during her "three-month probationary period." (Compl. ¶ 35). The latter allegation seems to undermine the former allegation because it is unlikely that plaintiff could have a property interest in her job while still a probationary employee. *See Bishop v. Wood*, 426 U.S. 341, 344 (1976) (referring to state law to define property interest); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578 (1972) (holding plaintiff must have a legitimate claim of entitlement to the benefit for it to qualify as a property interest); *Patterson v. Ramsey*, 413 F. Supp. 523, 531 (D. Md. 1976); *Samuels v. Tschechtelin*, 763 A.2d 209, 232 (Md. 2000) (defining at-will employment in Maryland).

In light of these contradictory allegations, I will grant the motion to dismiss as to plaintiff's property interest claim but give her leave to amend her complaint if she can assert the claim in good faith.

(2)

As a matter of law, plaintiff has failed to allege she has a liberty interest in her job sufficient to support a due process claim. Plaintiff alleges she was fired from her job and deprived of "her continued ability and right to speak on issues of public concern." (Compl. ¶¶ 36, 40.) As I have previously indicated, this allegation is sufficient to support plaintiff's claim under the First Amendment. However, discharge alone does not infringe upon a liberty interest. *See Roth*, 408 U.S. at 575 ("It stretches the concept of liberty too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another."). Assuming arguendo Lewis's views are expressed in the letter she typed for her husband, nothing the Board did by discharging her had any effect upon her continued ability to promulgate those views. *See Roth*, 408 U.S. at 575 n.14 (discussing the process due to protect against direct state infringement upon free speech rights and noting "the interest in holding a teaching job at a state university, simpliciter, is not itself a free speech interest"). The loss of her job did not impact upon any liberty interest Lewis possessed; if she so chose, plaintiff could have mailed the letter she typed the next day. *See id*. (limiting the situations in which process to protect a liberty interest is required to situations comparable to those involving the state's seizure of books or prevention of group meetings). Plaintiff was at liberty to speak on issues of public concern both before and after she was discharged by the Board. The claim asserting a deprivation of procedural due process based on a liberty interest will therefore be dismissed.

(3)

A predicate to plaintiff's procedural due process claim is that she had a property interest in her job. I have previously dismissed that claim but given plaintiff leave to file an amended complaint as to it. I likewise dismiss plaintiff's procedural due process claim but give her leave to reassert it if she files an amended complaint as to the property interest claim.[3]

(4)

In the complaint, Lewis alleges she had a "substantive due process right in her continued ability and right to speak about issues of public concern." (Compl. ¶ 42.) The Supreme Court has been reluctant to expand the scope of substantive due process beyond matters relating to marriage, family, procreation, and the right to bodily integrity. *See Albright v. Oliver*, 510 U.S. 266, 271-72 (1994); *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). To the extent the substantive due process claim is based on an alleged violation of Lewis's free speech rights, the claim is identical to and subsumed under her claim that her dismissal violated her First Amendment rights. *See Albright*, 510 U.S. at 273 ("Where a particular Amendment provides an explicit textual source of constitutional

---

[3]Plaintiff asserts a parallel procedural due process claim under Article 24 of the Maryland Declaration of Rights. If she files an amended complaint, she may reassert this state constitutional procedural due process claim as well. I note, however, that if she does so, she will not be able to obtain prospective injunctive relief because federal courts may not impose injunctions upon state officials to prevent future violations of state law. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 121 (1984).

Plaintiff also asserts a substantive due process claim under Article 24. Because I am dismissing the federal substantive due process claim and because the Maryland Declaration of Rights stands *in pari materia* with the due process clause of the Fourteenth Amendment, *see Robles v. Prince George's County*, 302 F.3d 262, 272 (4th Cir. 2002); *Williams v. Prince George's County*, 685 A.2d 884, 895 (Md. Ct. Spec. App, 1996), this claim will be dismissed as well.

11

protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (internal quotations omitted)); *Wilkes v. Young*, 28 F.3d 1362, 1364 n.2 (4th Cir. 1994); *Myers v. Town of Landis*, 957 F. Supp. 762, 770 (M.D.N.C. 1996).

Beyond that claim, any right Lewis had to her job is not protected by substantive due process. *See id*. Substantive due process protects fundamental rights created by the Constitution. *See Huang v. Board of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1142 n. 10 (4th Cir. 1990) Lewis's right to her job, if any, was created by state contract law and does not implicate substantive due process. *See id.*; *Maryland Classified Employees Assoc., Inc. v. State of Maryland*, 694 A.2d 937, 947 (Md. 1997). Therefore, I will dismiss Lewis's substantive due process claim.

C.

Plaintiff's claim under § 1985(3) fails because she has not made allegations bringing her within a class of persons entitled to the protections of that statute.[4]

In order to state a claim under § 1985(3), plaintiff must allege she was the victim of a conspiracy motivated by a specific class-based, invidiously discriminatory animus. *See United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983); *Buschi v. Kirven,* 775 F.2d 1240, 1257 (4th Cir. 1985). "To meet the requirement of a class-based discriminatory animus, the class must possess the discrete, insular, and immutable characteristics comparable to those

---

[4] Defendants have argued this claim should be dismissed because of the intracorporate immunity doctrine with respect to conspiracy claims. Because this claim will be dismissed on other grounds, there is no need to address the applicability of that immunity doctrine.

characterizing classes such as race, national origin, and sex." *Id.* (internal quotations omitted). The Fourth Circuit has further held that whether following "the majority or dissenting view in *Scott*, the class protected can extend no further than to those classes of person who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" *Id.* at 1258 (quoting *Scott*, 463 U.S. at 851).[5]

Plaintiff claims the discriminatory animus of the alleged conspiracy is "aimed at all individuals politically opposed to gun control laws." This allegation does not identify a class of individuals entitled to the protection of § 1985(3). "Individuals opposed to gun control laws" do not, as a class, possess the characteristics comparable to those characterizing classes such as race, national origin, and sex. In addition, like the whistleblower in *Buschi*, plaintiff "may, like any other state employee, seek protection from a discharge in retaliation for [her] exercise of [her] rights of free speech." *Id.* Plaintiff may pursue a claim under the First Amendment, as alleged in Count I. Thus, plaintiff is not a member of class in "unprotected circumstances" similar to those of the victims of Klan violence. The § 1985(3) claim will therefore be dismissed against all defendants.

A separate order is being entered herewith.


Date: May 7, 2003                         /s/_____
                                          J. Frederick Motz
                                          United States District Judge

---

[5]Cases cited by plaintiff taking a more expansive view of the scope of § 1985(3) are of doubtful continued precedential reliability. *See Buschi*, 775 F.2d at 1258. Plaintiff's reliance upon *Scott v. Moore*, 640 F.2d 708 (5th Cir. 1981), *reversed by United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 835-37 (1983), is entirely misplaced.